UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-20303-GAYLES

UNITED STATES OF AMERICA

v.

JESUS TRUJILLO,
KAREL FELIPE, and
TAMARA QUICUTIS,

           **Defendants.**
_____/

## UNITED STATES' TRIAL BRIEF

The United States of America, through the undersigned counsel, respectfully submits the following Trial Brief in advance of the trial date of September 25, 2023. The United States files this brief to outline issues for the Court that the United States expects may arise at trial.

## BACKGROUND

This case centers around fraudulent home health care services billed to Medicare through three home health agencies: NuWave; Tri-County; and Care Home Health. The defendants operated the scheme from Miami, but they used home health agencies located in Michigan to evade scrutiny and conceal their own location. They concealed the true owners and managers of the home health companies from Medicare, and, more fundamentally, their home health agencies provided no services whatsoever. The defendants simply used the home health companies to bill Medicare for tens of millions of dollars for patients whose identities were stolen.

The conspiracy took advantage of a key vulnerability in Medicare's processing of claims for home health therapy services at the time: the ability to submit Requests for Anticipated Payments ("RAPSs"). During the conspiracy period, Medicare allowed home health agencies to

submit "initial" claims, known as "RAP" claims, that resulted in Medicare immediately paying a portion (roughly 60%) of the cost of the full home health episode for the Medicare beneficiary. When the home health agency completed all services during an episode of care for a beneficiary, the home health agency was supposed to submit a final claim seeking the remaining reimbursement or reconciling any overpayment. Here, the conspirators only submitted RAP claims and did not submit final claims. This allowed them to obtain payments on the promise that services would be rendered, yet never go through the final claim process to substantiate the provision of services. In short, this was a straight bust-out scheme: RAP and run.

Medicare paid approximately $93 million based on false claims submitted by the three home health companies at issue in the Indictment. That money was laundered through an elaborate operation run from Miami that included both "office" and "street" participants. Various apartments in Miami were used as "offices" where conspirators gathered daily to check patient eligibility, bill Medicare, monitor bank accounts, and write checks from one shell company to the next. Equally important, some conspirators worked on the "street," which meant that they recruited nominee owners for shell companies, controlled those nominees, converted money to cash, and returned it to the "offices" for distribution.

## THE CHARGES AND SUMMARY OF EVIDENCE

Defendants Jesus Trujillo ("Trujillo"), Karel Felipe ("Felipe"), and Tamara Quicutis ("Quicutis") (collectively, "Defendants") each face two charges: conspiracy to commit health care fraud and wire fraud (Count 1); and conspiracy to commit money laundering (Count 2).

Trujillo worked primarily from the "street." He secured nominee owners for shell companies and for one of the home health agencies (Tri-County). He controlled the nominee owners and the process through which they converted money to cash. He returned cash to the

leaders of the conspiracy. At some point, Trujillo began using his own apartment to write checks and store documents relating to the conspiracy, but he did not go inside the primary "office" apartments and did not bill Medicare or check patient eligibility. Trujillo worked closely with Eduardo Rubal, one of the conspiracies' orchestrators, but did not work directly with Alberto Gonzalez-Delgado, the other orchestrator. Trujillo did not travel to the home health companies' locations but sent others there to monitor and control nominee owners. The evidence specific to Trujillo will consist of cooperator testimony identifying Trujillo and describing his role in the scheme, records seized from the office apartment showing distributions to "*gordo*" (Trujillo's nickname), as well as financial records that corroborate a large infusion of cash during the time of the conspiracy.

For their part, Felipe and Quicutis worked in the "office" apartments. They worked within a few feet of each other and Gonzalez-Delgado, who performed all the billing for the scheme. In contrast to Trujillo, Felipe and Quicutis did not recruit or deal with nominee owners, did not have access to the bank accounts used to launder the proceeds, and did not control the process through which Medicare money was converted to cash. Instead, Felipe wrote checks distributing money between shell companies—wearing latex gloves when handling checks, at the instruction of Gonzalez-Delgado, to keep his fingerprints off the checks. At one point during the conspiracy, Felipe took a private flight to Orlando to mail a document to Medicare because his bosses (Rubal and Gonzalez-Delgado) did not want the document to look like it was mailed from Miami. Quicutis also wrote checks between shell companies while wearing latex gloves, but her primary job was to take stacks of patient lists, log into a CMS website, and check those patients' eligibility for Medicare and home health services. These lists of patients were clearly from other health care providers, strongly suggesting they were stolen or unlawfully purchased. The lists were provided

to Quicutis by Gonzalez-Delgado, who Quicutis knew previously went to jail for Medicaid fraud. Quicutis provided the results of her work to Gonzalez-Delgado. Quicutis made less money than Trujillo or Felipe. Sensitive topics, such as the amount of money coming in the door, were discussed outside of Quicutis's earshot, or were discussed in English, a language which those individuals believed Quicutis did not speak. Cooperating witnesses will identify Felipe and Quicutis and explain their roles in the scheme. A witness will testify about photographs taken in the apartment that show Felipe and Quicutis present. Financial records and documents seized from the office apartment that track distributions will corroborate this testimony.

## **LEGAL ISSUES**

**I.    THE UNITED STATES EXPECTS THE EVIDENCE TO WARRANT A DELIBERATE IGNORANCE INSTRUCTION AS TO ALL THREE DEFENDANTS.**

At the previous pre-trial conference in this case, the Court conditionally included the deliberate ignorance instruction in its proposed jury instructions. The Court indicated that it will evaluate whether the instruction will be appropriate based on the evidence presented and, if so, whether the instruction should be revised to apply to specific facts. The United States believes the evidence at trial will warrant a deliberate instruction as to all three Defendants' knowledge of the following facts: (1) as to Count 1, their knowledge of the unlawful purpose of the conspiracy; and (2) as to Count 2, their knowledge that the proceeds came from some unlawful activity.

Courts in this district and throughout the Eleventh Circuit routinely give a deliberate ignorance instruction in similar fraud and/or money laundering cases. Just this year, this Court, Chief Judge Altonaga, and Judge Moore gave deliberate ignorance instructions in money laundering or health care cases. *See United States v. Anderson*, 23-CR-20124-ALTONAGA, D.E. 53 (Court's instructions to jury) (giving deliberate ignorance instruction in Medicare kickback

case); *United States v. Gonzalez*, 22-cr-20563-SEITZ, D.E. 72 (Court's Instructions to the Jury) (June 28, 2023) (in money laundering case, instructing jury of deliberate ignorance as proof of knowledge that "some unlawful activity occurred and that the monetary transactions involved funds derived from that unlawful activity"); *United States v. Zusmer et al.*, 21-cr-60253-MOORE, D.E. 356 (Court's instructions to the jury) (Jan. 30, 2023) (deliberate ignorance instruction given in a Medicare fraud, kickbacks, and false statements case involving durable medical equipment companies).[1]

Beyond these recent cases, the United States' request for a deliberate ignorance instruction in this case is supported by decades of Eleventh Circuit decisions upholding, under a *de novo* standard of review, the application of this instruction in fraud and money laundering cases. The Eleventh Circuit "has consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge." *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (internal quotations omitted); *see also United States v. Rodriguez*, 805 Fed. App'x 773, 775 (11th Cir. 2020) ("[I]t is well established that the government may show a defendant acted with knowledge by proving beyond a reasonable doubt that he was deliberately ignorant."). A deliberate ignorance jury instruction is appropriate where the facts "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991). The standard is the same whether the evidence pointing in the direction of deliberate ignorance is direct or circumstantial. *Arias*, 984

---

[1] Just like Defendant Trujillo, in *Zusmer*, one defendant was an undisclosed owner of a medical provider that submitted false claims to Medicare, but the false billing and fraud was largely carried out by a different conspirator who orchestrated the scheme. Like Trujillo, one of the defendants in *Zusmer* did not personally submit the false forms to Medicare.

5

F.2d at 1143; *see also United States v. Argiz*, 805 F. App'x 953, 955 (11th Cir. 2020) ("The knowledge element of a criminal statute 'can be proved by demonstrating either actual knowledge or deliberate ignorance.' In other words, 'if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'") (quoting *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) and *United States v. Hristov*, 466 F.3d 949, 952 (11th Cir. 2006) (internal citations omitted)). Furthermore, "where the evidence supports both actual knowledge and deliberate ignorance, the instruction is properly given." *Arias*, 984 F.2d at 1143 (internal quotation omitted).

A deliberate ignorance instruction is appropriate in conspiracy cases. The Eleventh Circuit recently confirmed that "[w]e previously have approved of the use of a deliberate ignorance instruction in a conspiracy case." *United States v. Guerra*, 2022 WL 244082, *4 (11th Cir. Jan 27, 2022) (citing *United States v. Willner*, 795 F.3d 1297, 1315 (11th Cir. 2015)). In *Guerra*, a case involving a conspiracy to possess with intent to distribute cocaine, a deliberate ignorance instruction was appropriate as to the defendant's knowledge of the unlawful purpose of the conspiracy because the evidence showed that the defendant overheard a conspirator "on the phone talking about 'going to get white girls,' which [the defendant] understood was a code for cocaine," among other facts. *Guerra*, 2022 WL 244082, at *5. Likewise, in *Willner*, the Eleventh Circuit upheld this Court's deliberate ignorance instruction in a Medicare fraud conspiracy case because the "instruction applied only to the 'issue of whether the defendant knew of the unlawful purpose of the conspiracy' and the court 'did not give a deliberate ignorance instruction on the issue of whether the defendant willfully joined the conspiracy.'" *Guerra*, 2022 WL 244082, at *4 (quoting *Willner*, 795 F.3d at 1315).

Moreover, Eleventh Circuit precedent makes clear that the Government can proceed on both a deliberate ignorance and actual knowledge theory; indeed, the pattern instruction describes both methods of proving knowledge. "It is error to give the instruction when there is evidence of <u>*only*</u> actual knowledge, <u>*but not*</u> when the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018) (emphasis added). For example, in *United States v. Caro*, 454 F. App'x 817, 875-76 (11th Cir. 2012), the Eleventh Circuit upheld Judge Lenard's decision to instruct the jury on deliberate ignorance in a case involving conspiracy to violate currency transaction reporting ("CTR") requirements. There, the evidence supported both actual knowledge and deliberate ignorance. Some witnesses "testified that they participated in the filing of false CTRs with [defendant] personally," therefore supporting the defendant's actual knowledge of the false filings. Other evidence established that a co-conspirator "set up a number of shell companies through which he filed false CTRs with [a checking casing company,] La Bamba," and there was testimony that nominee owners of shell companies were never in La Bamba, even though false CTRs were filed that reported these nominee owners were present at La Bamba to cash checks. *Id.* Likewise, in *Alexander*, the Eleventh Circuit agreed that "[a]lthough the government primarily advanced a theory of actual knowledge, th[e] evidence supported the district court's deliberate ignorance instruction" because there was evidence that, while the defendant was not expressly told about the source of the proceeds he helped launder, he agreed not to ask questions about its source and used others' names to transfer the money rather than his or his co-conspirators' names. *United States v. Alexander*, 857 F. App'x 592, 597 (11th Cir. 2021); *see also United States v. Stearns*, 385 F. App'x 885, 887 (11th Cir. 2010) (per curiam) (upholding deliberate ignorance instruction where the jury could have inferred either actual knowledge of fraudulent billing "or that [Stearns] suspected as

7

much but made an effort to avoid learning the truth.").

> **A. The Evidence Will Show Defendants Were Aware of a High Probability of the Unlawful Purpose of the Conspiracy and That the Funds Came from Some Unlawful Activity.**

The evidence will show that the Defendants each knew enough to make them aware of a high probability of the unlawful purpose of the conspiracy (to defraud Medicare) and that the money derived from some unlawful activity. Except for the two organizers of the scheme (Eduardo Rubal and Alberto Gonzalez-Delgado), no other participant had complete access to all aspects of the scheme. The evidence will show that this was by design. The criminal organization was siloed and participants were given access only to information they needed to know to carry out their portion of the scheme. The United States will present evidence of each Defendant's conduct giving rise to an inference that they knew of the unlawful purpose of the conspiracy and that they knew that the proceeds came from Medicare fraud or at least some unlawful activity. These facts include: wearing latex gloves when dealing with checks (all); flying to a different city just to mail a document to Medicare (Felipe); writing checks between dozens of companies each day (all); sitting in a small apartment every day where "Medicare" and "patients" were discussed or described in documents (Felipe and Quicutis); checking lists of patients on a CMS website to see who has Medicare and who can be billed for home health (Quicutis); being paid in cash (all); using nominee owners to acquire a home health agency and set up shell companies and bank accounts (Trujillo).

This evidence was tailor-made for a deliberate ignorance instruction. For example, Judge Ruiz recently gave a deliberate ignorance instruction in a Medicare fraud and money laundering case where the defendant, a lab owner, oversaw and orchestrated the fraud but employed numerous others to carry out the day-to-day operations of the scheme. *United States v. Patel*, 19-CR-80181-RUIZ, D.E. 392 (Dec. 14, 2022). In *Patel*, there was evidence of actual knowledge because the

defendant orchestrated the scheme, but there was also evidence that the defendant closed his eyes to obvious indicia of billing fraud. Like *Patel*, Trujillo recruited others to manage aspects of the scheme; Patel recruited patient brokers, while Trujillo recruited nominee owners and individuals who controlled nominee owners. Trujillo at minimum deliberately ignored obvious red flags when the people he recruited successfully converted the money to cash or successfully identified a nominee owner to complete Medicare paperwork.

Similarly, Felipe's and Quicutis's regular presence in an apartment where fraudulent Medicare billing was conducted and where Quicutis spent her days checking patient eligibility at the direction of a convicted Medicaid fraudster is exactly the kind of evidence that the Eleventh Circuit has found sufficient to warrant the deliberate ignorance instruction. In *United States v. Aherns*, 782 F. App'x 845, 849 (11th Cir. 2019) (per curiam), the Eleventh Circuit found that Judge Dimitrouleas did not err when instructing the jury on deliberate ignorance in a case involving a wire fraud conspiracy. "Shaffron insisted that [defendant Aherns] quickly withdraw the deposits and lie to the bank employees about the source of the funds, the transactions were structured to avoid IRS-reporting requirements, Aherns received over $4,000 in 1 week for doing minimal work, Shaffron was worried that the bank would find out what they were doing, and Shaffron instructed Aherns to stay calm and avoid looking nervous when making the withdrawals." *Id.* Similarly, in *United States v. Fernandez*, 553 F. App'x 927, 937 (11th Cir. 2014) (per curiam), the Eleventh Circuit upheld Judge Ungaro's decision to instruct the jury on deliberate ignorance in a Medicare fraud conspiracy case where defendant "admitted that he did not know whether a nurse actually visited his patients; he did not recall the names of many of the patients he allegedly treated; he chose not to learn how [co-conspirators] billed Medicare for the nursing notes that he submitted; and he 'did not monitor the amount' of money he received …." *Id.*; *see also United States v.*

9

*Agresti*, 18-CR-80124-RUIZ, 2022 WL 1720373, *3-4 (S.D. Fla. May 26, 2022), *appeal filed* 22-12125 (June 27, 2022) ("the trial record clearly establishes extensive evidence of deliberate ignorance on the part of the Defendant," including in the form of the defendant's own testimony that "he did not realize his co-defendant was testing patients [for drugs] so frequently, and further, he believe his co-conspirator was complying with his order … to reduce the frequency of testing."). Similarly, in *United States v. Pineda*, 843 F. App'x 174, 180 (11th Cir. 2021) (per curiam), the Eleventh Circuit affirmed Judge Ruiz's decision to instruct the jury on deliberate ignorance in a health care fraud and wire fraud conspiracy case. The defendant disclaimed knowledge of the fraud scheme, but admitted to certain facts that should have aroused his suspicion, like knowing that certain bills for pharmacy expenses were being paid from his bank account, knowing that a co-conspirator was "sleazy," and repeatedly cashing large checks on a conspirator's behalf.

Trujillo, Felipe, and Quicutis's exposure to facts indicating the existence of numerous shell companies, checks written between the shell companies, and the use of latex gloves all support an inference that the Defendants were aware of a high probability that the money at issue came from some unlawful activity. In *United States v. Jeanty*, 851 F. App'x 158, 162 (11th Cir. 2021) (per curiam), a tax refund fraud case, numerous facts warranted the deliberate ignorance instruction, including: "many checks addressed to other people arrived at Jacques's residence and other properties he owned, and he brought those checks to Jahira's and either deposited them into multiple bank accounts that he had opened or gave them to another conspirator to deposit. The checks were not obviously related to Jahira's business." In *Argiz*, the Eleventh Circuit found that Judge Williams did not err in giving the deliberate ignorance instruction in a money laundering case. 805 F. App'x at 955. "Argiz agreed to let a stranger deposit money into his bank accounts without any explanation of why the stranger needed to do so. Then, Argiz would hand deliver the

deposits to different unknown individuals at different locations pursuant to instructions from this stranger. For his services, Argiz was paid $500 per transaction." *Id.*

### B. The Evidence Will Show that Defendants Avoided Gaining Relevant Knowledge.

Furthermore, the United States will present evidence that each Defendant avoided gaining knowledge of the unlawful purpose of the conspiracies or the source of the proceeds. For example, there will be evidence that Quicutis and Felipe did not ask questions, despite their extremely unusual job setting and responsibilities. Any ordinary person who believed they were performing legitimate work would have asked questions under the circumstances. For his part, Trujillo did not go inside the apartment where the Medicare billing was performed and did not interact with Gonzalez-Delgado (who performed the billing), yet Trujillo found a nominee owner for a home health agency, directed others to take the nominee to Michigan to maintain a presence at the home health's location, and cashed out proceeds for the orchestrator of the scheme. As in *Argiz*, these "sketchy and inexplicable circumstances" lead to the "permissible inference that [Defendants were] suspicious of the scheme but purposefully chose not to investigate it in order to avoid learning the illegal nature of the funds." *Argiz*, 805 F. App'x at 955.

Similarly, in *Alexander*, the Eleventh Circuit upheld a Middle District of Florida Court's decision to instruct the jury on deliberate ignorance in a fraudulent sweepstakes scheme where the defendant was charged with wire fraud and money laundering conspiracies. 857 F. App'x at 597. The evidence at trial showed that the defendant was not told that the money he wired came from a fraud, but the conspirators "all agreed that [the defendant] would not ask questions about where the money was from" and the defendant "used stolen identities as the names of the senders, rather than using his name or the co-conspirators' names." *Id.*; *see also Aherns*, 782 F. App'x at 849 (evidence showed that the defendant "did not take any substantial steps to discover the source of

11

the funds … and the jury could have determined that she only pretended to believe the implausible explanations that she received …."). Here, Quicutis and Felipe did not ask questions about their job responsibilities and worked in an office filled with stolen patient identities.

Moreover, Defendants likely will challenge evidence that they were told key facts about the illegal activity or that they overheard reference to illegal activity. That underscores the need for a deliberate ignorance instruction. *See United States v. Puche*, 350 F.3d 1137, 1149 (11th Cir. 2003) ("To the extent defendants denied hearing any reference to illegal activity or drug sales, a jury could have found that the failure to inquire further by Orlando and Enrique, as well as Orlando's affirmative suggestion to Detective Oliva not to dismiss his business with Wilder Moreno, amounted to deliberate ignorance.").

The United States expects the defense to present argument and to question witnesses about what each Defendant was *not* told by co-conspirators and what information was withheld from Defendants. Particularly as to Defendants Felipe and Quicutis, who simply did less and had less visibility into the breadth of the scheme, this will likely be a key defense. All defendants likely will shift blame to the orchestrators, particularly Gonzalez-Delgado who billed Medicare. Under these circumstances, the jury should be advised that it may infer knowledge from deliberate ignorance. In *United States v. Ekpo*, 266 F. App'x 830, 833 (11th Cir. 2008) (per curiam), the Eleventh Circuit upheld a Northern District of Georgia Court's decision to instruct the jury on deliberate ignorance in a Medicare fraud case. The instruction was appropriate because the defendant "denied that he had any knowledge of Medicare billing procedures and stated that his son … was responsible for submitting all of V & A's claims to Medicare electronically." *Id.* "In contrast, [a former employee] testified that she confronted Epko about the items that were billed

to Medicare, but not delivered to the beneficiaries." *Id.* The defendant also admitted to certain facts in his testimony that were probative of deliberate ignorance. *Id.*

**II.     A DEFENDANT MAY BE CONVICTED UNDER 18 U.S.C. § 1956(h) EVEN IF THE DEFENDANT DID NOT COMMIT THE UNDERLYING SPECIFIED UNLAWFUL ACTIVITY.**

The United States expects the defense to vigorously challenge the proof of Defendants' involvement in Count 1 (conspiracy to commit health care fraud and wire fraud), since no Defendant was personally responsible for billing Medicare and did not visit the home health agencies in Michigan. While the United States expects the evidence to suffice to convict all three Defendants under Count 1, the United States expects Defendants to leverage their lack of personal involvement in billing to argue that they also lacked the requisite knowledge for Count 2 (money laundering conspiracy). The United States expects the defense to present this argument in Rule 29 arguments or to the jury in closing arguments. Such an argument would be improper to the extent it misstates the proof required under 18 U.S.C. § 1956(h).

The law in the Eleventh Circuit is clear that, to sustain a conviction under 18 U.S.C. § 1956(h), the United States need not prove that the defendant committed the underlying specified unlawful activity ("SUA") or even that the defendant knew that the money came from the precise SUA. "'It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity.'" *United States v. Castronuovo*, 649 F. App'x 904, 914 (11th Cir. 2016) (quoting *United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006)); *see also United States v. Magluta*, 418 F.3d 1166, 1174 (11th Cir. 2005) ("[t]he government did not have to prove, however, that [defendant] committed the [underlying] felony drug offense [in order to prove that the defendant committed money laundering]."). "[T]he government [is] required to prove only that [defendant] knew that

13

the funds involved represented the proceeds of unlawful activity." *United States v. Galdos*, 308 F. App'x 346, 358 (11th Cir. 2009) (per curiam); *see also Alexander*, 857 F. App'x at 596 ("The money laundering statute requires only that Mr. Hassan knew that the money represented 'the proceeds of some form of unlawful activity,' not necessarily that the funds were wire-fraud proceeds from a specific unlawful scheme.").

In *Galdos*, the evidence "supported a reasonable inference that Galdos knew that the funds were from some form of illegal activity," even though the defendant disputed the Government's proof that he knew that the proceeds came from health care fraud. 308 F. App'x at 358. In particular, the Eleventh Circuit pointed to the following facts in upholding the defendant's money laundering conviction, which are remarkably similar to the facts in the present case:

> (1) Galdos knew the occupations of the parties involved and that none of them had any experience in running companies, let alone health care companies; (2) Galdos knew that the checks he cashed contained phony notations for services he had not provided; (3) Galdos had been instructed, and he, in turn, instructed others to keep the financial transactions secret; (4) Galdos used a post office box as the address for Associate Marketing to ensure that the company's operations were secret and that no one interfered with them; and (5) Galdos lied repeatedly about his association with the shell companies and the fact that he had cashed checks.

*Id*. Likewise, in *Hernandez*, the defendant was only charged with money laundering, not with the underlying health care fraud. *United States v. Hernandez*, 490 F. App'x 250, 252 (11th Cir. 2012) (per curiam). Nonetheless, the defendant had the requisite knowledge because "Hernandez obtained the patient lists needed to fabricate the bogus prescriptions, and he arranged for others to cash the Medicare checks to Mercy Medical." *Id*.

Furthermore, the United States may prove a defendant's participation in a conspiracy to commit money laundering through circumstantial evidence. "The existence of an agreement [to commit money laundering] may be proven by circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States*

14

*v. Silvestri*, 409 F.3d 1311 (11th Cir. 2005) (quoting *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir. 1982)) (internal quotation marks omitted). In *Silvestri*, the Eleventh Circuit explained that "[i]f the jury found that Silvestri knew that one element of the scheme was fraudulent, it could reasonably consider that knowledge, under all the facts presented, as evidence that he knew other aspects of the scheme were similarly fraudulent." *Id.*

## CONCLUSION

The United States respectfully requests that the Court consider these legal authorities when deciding whether to deliver a deliberate ignorance instruction and in crafting an appropriate instruction. In addition, the United States may rely on some of these authorities in opposing any Rule 29 motion for judgment of acquittal on Count 2 or in objecting to improper closing arguments that misstate the proof required to sustain a conviction on Count 2.

        Respectfully submitted,

        GLENN S. LEON
        CHIEF
        CRIMINAL DIVISION, FRAUD SECTION
        U.S. DEPARTMENT OF JUSTICE

        MARKENZY LAPOINTE
        UNITED STATES ATTORNEY

By:    */s/ Jamie de Boer*
        Jamie de Boer
        Florida Special Bar No. A5502601
        D. Keith Clouser
        Florida Special Bar No.
        Trial Attorneys
        U.S. Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, N.W.
        Washington, D.C. 20005
        Tel: (202) 616-3842 (de Boer)
        Tel: (202) 256-0867 (Clouser)
        Jamie.deBoer@usdoj.gov
        David.Clouser@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2023, I served and filed the foregoing document with the Clerk of the Court via CM/ECF.

By: */s/ Jamie de Boer*
Jamie de Boer
Trial Attorney
U.S. Department of Justice