UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-20303-GAYLES

UNITED STATES OF AMERICA

v.

JESUS TRUJILLO,

        **Defendant.**

_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, through undersigned counsel, respectfully submits this Sentencing Memorandum in advance of the sentencing of defendant Jesus Trujillo ("Defendant" or "Trujillo").  Defendant's conduct as both a money launderer and beneficial owner of a fraudulent home health agency that was used to bilk Medicare out of more than $57 million warrants a substantial prison sentence.

Trujillo joined the conspiracy as a money launderer for Eduardo Rubal and Alberto Gonzalez-Delgado, having previously laundered money for Rubal in a prior Medicare fraud scheme.  At first, Trujillo converted fraud proceeds from one of the fraudulent home health agencies, NuWave, by cashing checks at banks and check-cashing stores all over Miami.  (D.E. 366, Presentence Investigation Report ("PSR") at ¶¶ 22-24.)  Trujillo used fake businesses and nominee owners to move the money and conceal that it came from Medicare fraud.  (PSR at ¶¶ 16, 22-24.)  Trujillo soon approached Rubal about opening a home health company of his own, and Trujillo subsequently became a 50% partner in Tri-County, with Rubal and Gonzalez-Delgado handling the billing while Trujillo handled the money laundering.  (PSR at ¶ 19.)  Everything about the scheme was fake: the "patients" consisted of Medicare beneficiaries whose identities were stolen; the "doctors" had no knowledge that their licenses were used to justify fraudulent bills; no

services were provided whatsoever; and the fraud proceeds were laundered through webs of shell companies. (PSR at ¶¶ 17, 29.) Trujillo was essential to the success of the scheme, and he recruited others, including Alexey Gil and Vicente Gonzalez Acosta, into it. (PSR at ¶¶ 19, 32.)

On December 18, 2023, the United States filed a Sentencing Agreement in which the parties agreed on the Sentencing Guidelines range to recommend to the Court. (D.E. 376.) In that Sentencing Agreement, the United States and Defendant agreed to recommend jointly a total adjusted offense level of 35. The offense level of 35, which equates to a Guidelines Range of 168 to 210 months' imprisonment, speaks to the severity of the offense. In fashioning a sentence from these guidelines, the United States asks the Court to consider the seriousness of this offense, the need to deter this Defendant and others who believe they can get away with such brazen frauds by concealing their identities, and the need to curb health care fraud in South Florida and nationwide.[1] The United States respectfully submits that a custodial sentence of 188 months' imprisonment would provide punishment for the instant offense that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

I.  **PROCEDURAL HISTORY AND OFFENSE CONDUCT.**

On May 11, 2021, a grand jury sitting in the Southern District of Florida returned an indictment charging Trujillo with one count of conspiracy to commit health care fraud and wire fraud (Count 1), and one count of conspiracy to commit concealment money laundering (Count 2). On September 25, 2023, Trujillo pled guilty to Counts 1 and 2. (D.E. 292.) Trujillo pled guilty

---

[1] The United States and Defendant have reached an agreement, D.E. 376-1, as to the guidelines calculation. In light of that agreement, the United States does not address herein the Defendant's proposed guidelines calculations and his legal objections to the PSR, which Trujillo filed on December 11, 2023, before the parties reached their agreement [D.E. 371].

after jury selection began in his trial, but notified the Court of his intention to plead guilty two business days before trial began. Trujillo pled open to the indictment without a plea agreement.

At the recent trial in the above-captioned matter against defendants Karel Felipe ("Felipe") and Tamara Quicutis ("Quicutis"), the United States proved that Gonzalez-Delgado and Eduardo Rubal orchestrated and led a widespread conspiracy to steal tens of millions of dollars from Medicare. The conspiracy involved three home health companies located in Michigan: NuWave; Tri-County; and Care Home Health. (PSR ¶ 15; 9/26/23 Trial Tr. at 120:4-22 (Medicare program witness testimony); GX 719.) Rubal and Gonzalez-Delgado recruited others into the scheme to help acquire home health companies and put them in the name of nominee owners, bill fraudulent claims to Medicare, recruit and control nominee owners, move fraud proceeds between shell-company bank accounts, and convert those proceeds to cash. (PSR ¶¶ 16-17, 32-33.)

The government presented evidence at trial that showed that patient identities were purchased or lifted from prior schemes. 9/27/23 Trial Tr. at 23:15-24:1 (Rubal testimony). None of the patients gave consent for his or her identities to be used, and none of the patients received the services for which the conspirators billed. (*See* 9/26/23 Trial Transcript ("Trial Tr.") at 169; 9/27/23 Trial Tr. at 24:2-4 (Rubal testimony); 9/27/23 Trial Tr. at 15 (beneficiary testimony that the beneficiary never received any services).) Gonzalez-Delgado and Rubal enlisted others, including Trujillo, to create shell companies and bank accounts for those companies, all in the name of nominee owners who agreed to lend their identities to the scheme in exchange for bribes. PSR ¶ 32. The defendants and their co-conspirators then transferred the Medicare fraud proceeds between accounts and ultimately cashed out the money using money laundering groups, including a money laundering group controlled by Trujillo. (PSR ¶¶ 22-23; 9/27/23 Trial Tr. 50:21-51:6 (Rubal testimony).)

Trujillo agreed at his plea hearing that, between October 2016 and May 2019, he knew that Rubal had multiple home health companies that fraudulently billed Medicare for services that were not being provided. Trujillo further admitted to having conversations with co-conspirators regarding the fraudulent nature of the Medicare billing, including co-conspirators Gil, Rubal, and Gonzalez Acosta. Trujillo agreed that he recruited people, including Gil, to open fake companies and bank accounts in the names of nominee owners that were established for the sole purpose of moving fraud proceeds and with the intent to conceal the source of those proceeds. Trujillo agreed that he supervised, through Gil, a group of nominee owners who converted the fraud proceeds into cash and that Trujillo received that cash and distributed it to Gil and others, including to himself.[2] Consistent with these admissions, Rubal testified at trial that Trujillo's "role was to pretty much clean the money for me." (9/26/23 Trial Tr. at 162:5-9.) Trujillo had a "percentage stake" in the business as one of the people who laundered money. (9/27/23 Trial Tr. at 27:1-7.)

At trial, the United States admitted evidence showing "how much money was given to the people to cash out, how much money would come in from the ATMs, how much money people were making percentage-wise from the whole thing that we were doing." (9/27/23 Trial Tr. at 102:11-17; GX 512.). For the period February 2017 through April 2018, the evidence showed that the "Gordo" group (Trujillo's money laundering group) was paid a total of $4,749,474. (GX 512B.) From that same period, Medicare paid NuWave a total of $49,450,263.11, of which approximately $36,928,731 was laundered by the various conspirators. (*See* GX 720; 750A.) Evidence admitted at trial showed that Medicare paid Tri-County a total of $7,771,884, (GX 720),

---

[2] The government has not yet received the transcript from the plea hearing to verify the precise wording of the proffer given at the plea hearing. However, this summary of the factual proffer is taken from a version of the proffer exchanged with defense counsel, which is what the government read during Trujillo's plea hearing.

4

of which $7,423,086 was laundered by the Defendant using his network. (*See* GX 750B.) Since Trujillo had a 50% stake in Tri-County, he would have received approximately $3.7 million from the Tri-County portion of the scheme, to distribute amongst himself and his network.[3]

## II. THE PARTIES' AGREED GUIDELINES RECOMMENDATION.

The parties have reached an agreement with respect to the Sentencing Guidelines range applicable to the Defendant. (D.E. 376.) Pursuant to that agreement, the parties have agreed to jointly recommend that the Defendant's total offense level is **35**. (*Id.*) That offense level is calculated as follows:

Pursuant to Section 2S1.1(a)(1), the base offense level for the Defendant's offense conduct is determined by applying the offense level for the underlying offense from which the laundered funds were derived. The offense level for the underlying offense (conspiracy to commit health care fraud and wire fraud) is found at Section 2B1.1 of the Guidelines Manual. Because the Defendant was convicted of an offense where the statutory maximum term of imprisonment is 20 years or more, the base offense level is seven. Because the loss (agreed to be $57,222,147) was more than $25,000,000, but not more than $65,000,000, the offense level is increased 22 levels. USSG § 2B1.1(b)(1)(L). Because the defendant was convicted of a Federal health care offense involving a Government health care program and the loss to the program was more than $20,000,000, the offense level is increased four levels. USSG § 2B1.1(b)(7)(A)(iii). The total base offense level is therefore **33**.

Because Trujillo pled guilty and was convicted under 18 U.S.C. § 1956, the offense level is increased by **2 levels**. U.S.S.G. § 2S1.1(b)(2)(B).

---

[3] In light of the Sentencing Agreement, the Government no longer anticipates calling witnesses to testify regarding the Defendant's conduct and role in the scheme, but notes that the Government expected the witnesses to testify consistent with the above-described facts.

The offense level is further increased by **3 levels** because Trujillo supervised Alexey Gil, Vicente Gonzalez-Acosta, and several nominee owners. *See* USSG § 3B1.1(b). Because Trujillo reported to Eduardo Rubal, the leader of the scheme, his aggravating role is that of manager/supervisor, rather than organizer/leader.[4]

The total offense level is reduced by 3 levels pursuant to Section 3E1.1 because Trujillo indicated his intent to plead guilty and notified the Court of his intention before trial.

\* \* \* \* \*

Under the parties' Sentencing Agreement, the offense level is **35**. The Guidelines Range for this offense level is 168 to 210 months. The United States recommends a sentence of 188 months, which, as discussed below, reflects the seriousness of the offense, the Defendant's position in the scheme, the Defendant's recidivism, and the need to deter both the Defendant and others who may be tempted to engage in misconduct similar to that of the Defendant.

The United States further recommends that the Court order restitution in the amount of $44,351,817, which represents the amount that Medicare released to Nu-Wave and Tri-County. (*See* GX 750A-B.) Restitution should be joint and several with the co-defendants in this case and in *United States v. Rubal et al.*, No. 19-cr-20354-SMITH (S.D. Fla.).

**III.    THE DEFENDANT'S SENTENCE MUST REFLECT THE SERIOUSNESS OF THE OFFENSE, PROVIDE SPECIFIC AND GENERAL DETERRENCE, AND BE CONSISTENT WITH THE SENTENCES OF SIMILARLY SITUATED CO-CONSPIRATORS.**

The nature and seriousness of these offenses compels a significant custodial sentence. *See* 18 U.S.C. § 3553(a)(2)(A). As described in the PSR and proved at the trial of the Defendant's co-conspirators, this scheme was broad, brazen, and morally bankrupt. The Defendant and his co-

---

[4]    Because Defendant is receiving an aggravating role enhancement, he is not eligible for the "zero-point offender" decrease under Section 4C1.1 of the United States Sentencing Guidelines.

conspirators opened or acquired home health companies in Michigan, billed Medicare for fake services never provided, and laundered the stolen money through dozens of bogus companies by using nominee owners recruited for the very purpose of fleeing to Cuba when law enforcement caught on. PSR at ¶¶ 15-19, 22-24. But this scheme involved more than the theft of tens of millions of dollars from Medicare, the abuse of patient and physician identities, and the laundering of millions of dollars through fake companies and bank accounts; it jeopardized patients' access to care. As Eduardo Rubal testified at trial, they would "receive calls from patients, like from actual patients that will be trying to enroll and receive real home health services at another real office, and they were not able to enroll because they had been enrolled in our office." (9/26/23 Trial Tr. at 220:21-221:1 (Rubal testimony).) By billing for fake services to steal from Medicare, the Defendant and his co-conspirators threatened the ability of those patients to get the care they needed.

      This Court also must consider deterrence—both specific deterrence of the Defendant and general deterrence of other potential defendants—in fashioning an appropriate sentence. 18 U.S.C. § 3553(a)(2)(B). Although this conviction is Trujillo's first fraud conviction, it is not his first fraud scheme. Information provided by Rubal pursuant to his cooperation agreement with the government showed that Trujillo partnered with Rubal in a prior fraud scheme that operated in the exact same manner. Trujillo served as a money launderer in the prior scheme. The charged scheme, however, was far more lucrative than the prior scheme; thus, Trujillo sought to become the beneficial owner of a home health company in the charged scheme—to reap more proceeds from the fraud. Moreover, while Trujillo accepted responsibility for his actions, and the guidelines range recommended by the Government reflects his acceptance of responsibility, he only did so on the eve of trial, after numerous delays and trial continuances.

The Court should also sentence Trujillo in a manner that deters others from engaging in Medicare fraud schemes, particularly bust-out schemes that are notoriously difficult to investigate and prosecute. As the Court is aware, South Florida is plagued by health care providers and individuals who engage in deception and fraud to bilk Medicare. These schemes are driven by people, like Trujillo, who are motivated by greed and who do not believe they will get caught because they operate in complete secrecy—concealing their identities at every step. This greed and indifference to using others for personal gain is what drives these schemes.

As the Eleventh Circuit has noted, post-*Booker*: "[E]conomic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus these crimes are "prime candidate[s] for general deterrence." *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the *Martin* court noted that the legislative history of Section 3553 showed that Congress viewed deterrence as "particularly important in the area of white-collar crime . . . . even where [the defendants] might themselves be unlikely to commit another offense." *Id.* (emphasis added) (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Court in *Martin* held that "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. General deterrence is "particularly important in the area of white-collar crime," because would-be perpetrators are watching. *See id.*

Furthermore, general deterrence is especially important in white collar offenses where greed is the motive. In *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014), for example, the Eleventh Circuit rejected a probationary sentence for a white-collar defendant—even though the Government had filed a 5K motion because "general deterrence is an important factor in white

collar cases, where the motivation is greed . . . . [W]e have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *Id.* at 1308. The court went on to say that the low sentence imposed conveys the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty," and accordingly was not just. Second, too-low sentences do not serve as general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* at 1310-11; *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("[B]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). The guidance from *Hayes* and *Kuhlman* squarely applies in full force to Trujillo.

    Moreover, the Court may consider the sentences of co-defendants or defendants in related cases in fashioning an appropriate sentence for Trujillo. In the table below, the United States sets forth the sentences imposed on other conspirators in this or a related case. Other than Rubal and Gonzalez-Delgado, Trujillo was the only conspirator who had an ownership stake in one of the home health companies. Trujillo controlled and supervised Gonzalez Acosta, the defendant who received the second lengthiest sentence. Alexander Fernandez was also a money launderer like Trujillo but, unlike Trujillo, did not control or own a home health company. The Government's recommended sentence of 188 months therefore accurately reflects Trujillo's role in this scheme relative to his co-conspirators.

9

| **Defendant Name** | **Case No.** | **Conviction** | **Sentence** |
|---|---|---|---|
| Eduardo Rubal | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 210 months |
| Alberto Gonzalez-Delgado | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 210 months |
| Vicente Gonzalez Acosta | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 188 months |
| Alexander Fernandez | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 120 months |
| Yaxing Tapanes | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 97 months |
| Jose Carlos Valladares Rivera | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 97 months (sentence reduced to 68 months after Rule 35 motion) |
| Didier Arcia | 21-cr-20303-GAYLES | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 80 months (sentence includes approx. 33% 5k reduction) |
| Hector Suarez Gonzalez | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 78 months (sentence reduced to 48 months after Rule 35 motion) |
| Alexey Gil | 21-cr-20303-GAYLES | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 65 months (sentence includes approx. 33% 5k reduction) |
| Antonio Jimenez | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 48 months |
| Jeffrey Avila | 21-cr-20303-GAYLES | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | Probation (sentence includes approx. 33% 5k reduction) |

**CONCLUSION**

For the foregoing reasons, the United States requests that the Court adopt the Guidelines calculation in the Parties' Sentencing Agreement. The United States further requests that the Court sentence Trujillo to a prison term of 188 months and order restitution as described herein.

Dated: December 19, 2023           Respectfully submitted,

                                                    MARKENZY LAPOINTE
                                                    UNITED STATES ATTORNEY
                                                    SOUTHERN DISTRICT OF FLORIDA

                                                    GLENN S. LEON, CHIEF
                                                    CRIMINAL DIVISION, FRAUD SECTION
                                                    U.S. DEPARTMENT OF JUSTICE

                     By:     */s/ D. Keith Clouser*
                                                    Jamie de Boer
                                                    Florida Special Bar No. A5502601
                                                    D. Keith Clouser
                                                    Florida Special Bar No. A5502882
                                                    Trial Attorneys
                                                    United States Department of Justice
                                                    Criminal Division, Fraud Section
                                                    1400 New York Avenue, NW
                                                    Washington, DC 20005
                                                    Tel.: (202) 304-6801 (de Boer)
                                                    Tel.: (202) 256-0867 (Clouser)
                                                    Jamie.deBoer@usdoj.gov
                                                    David.Clouser@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that, on December 19, 2023, I served and filed the foregoing document with the Clerk of the Court via ECF.

                                      By:   /s/ *D. Keith Clouser*
                                                  D. KEITH CLOUSER
                                                  Trial Attorney
                                                  United States Department of Justice
                                                  Criminal Division, Fraud Section